# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL PAIGE, | CASE NO. 4:21-CV-00579-CEF |
| Petitioner, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN DOUGLAS A. FENDER, | **REPORT AND RECOMMENDATION** |
| Respondent. |  |

On February 8, 2021, Petitioner Michael Paige, a prisoner in state custody, filed a *pro se* petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). On June 14, 2021, Respondent Douglas Fender, in his official capacity as Warden of the Lake Erie Correctional Institution (hereinafter, the State), filed a Return of Writ. (ECF #7). After filing two motions for extension of time (ECF #8, 11) but the Clerk's office not receiving his filings by November 30, 2021 as requested, I *sua sponte* directed Mr. Paige to file his Reply to the Return of Writ no later than December 22, 2021 (ECF #12). Mr. Paige filed his Reply on November 28, 2021 and it was received in the Clerk's office on December 17, 2021. (ECF #13).

The District Court has jurisdiction over the petition under § 2254(a). On March 18, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge to prepare a Report and Recommendation. (Non-document entry of Mar. 18, 2021). On May 26, 2021, the

1

case was reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 26, 2021).

For the reasons discussed below, I recommend the District Court **DISMISS** the petition as untimely. If the District Court determines tolling is available to Mr. Paige, I further recommend the District Court **DISMISS** Grounds Two and Five as procedurally defaulted, and **DISMISS** Ground Four as not cognizable, and **DENY** Grounds One and Three as meritless. I further recommend the District Court **DENY** Mr. Paige a certificate of appealability.

## Procedural History

**A.    Factual Findings of the Court of Appeals**

The Ohio Court of Appeals, Seventh Appellate District, set forth the facts of this case on direct appeal. These findings are presumed correct unless Mr. Paige rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Seventh District determined:

[¶3] Appellant's conviction stems from an incident that occurred on or around March 1, 2012. Munir Blake ("Blake") resided on the first floor of a duplex with his wife and five children. Jasmin Fletcher ("Fletcher") lived on the second floor of the duplex. Blake and Fletcher engaged in a verbal exchange the day prior to the incident because Blake recently discovered that Fletcher had run an extension cord from her second floor apartment to the basement in order to tap into his electrical line. She no longer had service and was in the process of moving out of her apartment. On the day of the incident, two of Blake's children, a son and daughter ages 9 and 11, walked home from school and entered their apartment. Blake's son watched television while his daughter went to her room. Blake was sleeping in his own room, because he was unwell. He emerged a short time later to check his electrical line and make sure that Fletcher had not plugged an extension cord into his outlet again. After Blake left the apartment, his children both heard him argue with two other individuals. The son said he recognized only his father's voice. The daughter said she recognized her father's voice, Fletcher's voice and a third, unknown individual. At trial she testified this voice "was high pitched and it sounded like a woman." Blake's son testified that he could see his father in the doorway between the kitchen and the back stairwell. He also testified that he could hear his father arguing that his electric bill was "sky high" because of Fletcher. This was followed by one of the other individuals saying they were going to get a gun. Blake's daughter testified that she

2

heard the unknown voice say, "I will shoot you right now." She also heard Fletcher say, "that's five dollars down the drain; you cut my cord." Both children said they heard someone run upstairs and then back down while their father continued arguing. Then they both heard multiple gunshots and Blake's son ran out of the apartment. He turned around to get his sister, and they saw their father lying on the ground. Both children ran out of the building to a neighbor's home. Blake's son testified that he saw Fletcher standing outside of their duplex near the front porch moments after the shooting occurred.

[¶4] Police and an ambulance were called. Officer Anthony Marzullo ("Marzullo") responded for the Youngstown Police Department. He recovered seven spent shell casings, all from a .45 caliber gun. He also recovered five bullets from the scene. All casings and bullets were found in the area of the back landing near the kitchen.

[¶5] Dr. Joseph Ohr, Mahoning County Deputy Coroner, responded to the scene and later performed the autopsy on Blake. He testified that Blake suffered nine gunshot wounds. He testified the entry wounds were consistent with an individual firing from an elevated position on the stairs.

[¶6] Youngstown Detective Sergeant Rick Spotleson ("Det./Sgt. Spotleson") was assigned as lead investigator to Blake's murder. Detective Sergeant Daryl Martin ("Det./Sgt. Martin") assisted Det./Sgt. Spotleson in the investigation. At trial, Det./Sgt. Spotleson testified that during the investigation he learned of the prior confrontation between Blake and Fletcher regarding her use of Blake's electricity. He observed an extension cord that extended down the steps from the second floor to the basement, and that a phone charger was connected to it in Fletcher's apartment. After interviewing witnesses, including the children, Fletcher became a person of interest. She was arrested and interviewed by Det./Sgt. Spotleson several hours after the shooting. Det./Sgt. Spotleson revealed at trial that this interview lead to Appellant:

Q And you interviewed [Fletcher]?
A Yes
Q Did she tell you that she was present when this occurred?
A Yes
Q Did she identify a second person of interest?
A Yes
Q And who was that?
A Michael Paige

[¶7] Det./Sgt. Spotleson testified he then concluded Appellant was a person of interest, and obtained a home address for Appellant. Late in the evening of the incident, police went to the address and found Appellant and his girlfriend. Det./Sgt. Spotleson obtained consent to search the residence. A .45 caliber firearm magazine

clip was recovered from the scene. These bullets were consistent with the casings found at the murder scene.

[¶8] Appellant was not placed under arrest at the conclusion of the search. However, Appellant and his girlfriend agreed to come to the station to give statements. The interview took place at approximately 1:20 a.m. on the day after the incident. During Appellant's interview with Det./Sgts. Spotleson and Martin he gave several different accounts of his role in the incident. Det./Sgt. Spotleson testified at trial that Appellant first said that he saw Fletcher during the day to help her repair her car but did not see her that night and was not at her apartment. Appellant then told officers that he was at Fletcher's apartment on the night of the incident but was outside on his phone, and when he heard gunshots, he left. Appellant's third version was that he had been in Fletcher's apartment helping her move. He remained in the apartment while Fletcher went downstairs. He heard her engage in an argument, heard gunshots, and then Fletcher ran upstairs to the apartment yelling "let's go, let's go."

[¶9] Det./Sgt. Spotleson testified that at the end of the interview he did not believe he had enough evidence to arrest Appellant. A gunshot residue test was performed on Appellant, but the results were negative.

[¶10] At approximately 8:40 a.m. the following morning, Det./Sgts. Spotleson and Martin again interviewed Fletcher. They showed Fletcher the video recording of Appellant's interview. On direct examination, Det./Sgt. Spotleson testified to the following:

Q After you showed her the portion of the interview with the defendant did she change her statement?
A Yes.
Q In the second statement she gave did she tell you who the shooter was?
A Yes.
Q Did she tell you where the shooter was standing?
A Yes.
Q Did she tell you where she was standing?
A Yes.
Q And where the victim was standing?
A Yes.
Q Based on your assessment of the scene, your conversations with Dr. Ohr and what she had told you, what Jasmin Fletcher told you, did that make sense to you?
A Yes.
Q At the end of the interview did you have a suspect?
A Yes.
Q Who was that suspect?
A That suspect was Michael Paige.

[¶11] Det./Sgt. Spotleson also testified on direct regarding the second Fletcher interview:

Q Did she talk about ~ did you discuss with her whether or not [Blake] had a gun?
A Yes.
Q Did he have a gun?
A No.
Q All right. Did you discuss with her whether or not she was threatened by Mr. Blake?
A Yes.
Q Was she?
A No.

[¶12] Appellant was arrested that day and brought to the Youngstown Police Department. After being read his *Miranda* warnings, he gave another statement to Det./Sgts. Spotleson and Martin. A video recording of the interview was admitted into evidence at trial. Det./Sgt. Spotleson testified on direct that Appellant initially repeated that Fletcher was the shooter. This was his third version of the story from his earlier interview. Appellant eventually admitted, however, that he shot Blake:

Q Was there a time when finally he told you that he did it?
A Yes.
Q Did he tell you—when he told you that did he tell you where the victim was standing?
A Yes.
Q Did he tell you where Jasmin Fletcher was standing?
A Yes.
Q Did he tell you where he was standing?
A Yes.
Q And was that consistent with what Jasmin Fletcher had told you and with what Dr. Ohr ~ what his findings were?
A Yes.

[¶13] At trial, both Det./Sgts. Spotleson and Martin testified that Appellant admitted in the final interview that he shot Blake. At the end of this interview Det./Sgts. Spotleson and Martin left the room. Appellant's girlfriend was allowed into the interview room and Appellant was allowed to speak to her. The entire encounter, including Appellant's interview with the detectives and the conversation between Appellant and his girlfriend, was recorded and later played at trial.

[¶14] Appellant was indicted on March 8, 2012, on one count of aggravated murder in violation of R.C. 2903.01(A), (F), an unclassified felony; with a firearm specification in violation of R.C. 2941.145(A); one count of murder in violation of

R.C. 2903.02(A), (D), an unclassified felony, with a firearm specification in violation of R.C. 2941.145(A); two counts of tampering with evidence in violation of R.C. 2921.12(A)(1), (B), felonies of the third degree; and one count of obstructing justice in violation of R.C. 2921.32(A)(5), (C)(4), a felony of the third degree.

[¶15] Appellant was arraigned on March 13, 2012. Court-appointed defense counsel filed a motion on September 17, 2012, seeking to suppress statements made by Appellant to police. In this motion counsel argued that the *Miranda* warnings were cursory in nature and Appellant was under the influence of drugs at the time the statements were given. A hearing on the motion to suppress was held and the motion was overruled by the trial court in a judgment entry dated October 25, 2012.

[¶16] Jury trial commenced on February 24, 2014. The jury found Appellant not guilty of aggravated murder. This jury was unable to reach a unanimous verdict on the remaining charges, however, so in a judgment entry dated March 4, 2014, the trial court declared a mistrial on these charges and discharged the jury.

[¶17] New counsel was appointed. Appellant filed a *pro se* motion attempting to revoke his previously executed waiver of the right to a speedy trial. His newly appointed counsel raised the issue of his competency to stand trial on August 6, 2015. A hearing on Appellant's competency was held on October 5, 2016 and the trial court ultimately concluded Appellant was competent to stand trial.

[¶18] A second jury trial commenced on January 11, 2016. In a judgment entry dated January 13, 2016, the trial court *sua sponte* declared a mistrial after the jury was empaneled, because Appellant filed a *habeas corpus* proceeding naming the assistant prosecuting attorney as a defendant in the United States District Court for the Northern District of Ohio.

[¶19] Ultimately, a jury trial in this matter took place on January 3, 2017. The state presented the testimony of several witnesses, including Det./Sgts. Spotleson and Martin. Both the state and defense counsel subpoenaed Fletcher as a witness. However, Fletcher failed to appear and a material witness warrant was issued. While Fletcher appeared pursuant to this warrant, the state rested without testimony from Fletcher. Appellant did call Fletcher as a witness. Fletcher appeared and asserted her Fifth Amendment privilege against self-incrimination and refused to testify. A discussion ensued about whether Fletcher was able to assert a Fifth Amendment right. The discussion included statements from Fletcher's counsel, who was present in the courtroom. The trial court concluded that, as Fletcher had entered a guilty plea for her part in the crime but had not yet been sentenced, she retained her right to invoke the privilege. The trial court reasoned that the incrimination inherent in her guilty plea was not complete without the sentence being imposed. At the close of evidence, the trial court charged the jury not only as to murder, but on the lesser included offense of voluntary manslaughter. The jury returned a guilty verdict on the

murder charge and the firearm specification, and also on the charge of tampering with the evidence.

[¶20] A sentencing hearing was held on January 24, 2017. The trial court sentenced Appellant to life imprisonment with parole eligibility after fifteen years for the murder conviction, three years for tampering with evidence to be served concurrently with the sentence imposed for murder, and three years for the firearm specification, to be served consecutively to the sentence imposed for the murder charge. Appellant filed this timely appeal.

*State v. Paige*, No. 17 MA 0033, 2019 WL 1400327, at *14 (Ohio Ct. App. Mar. 25, 2019)

(citations omitted).

**B.    State Court Conviction and Sentence**

On March 8, 2012, a Mahoning County Grand Jury indicted Mr. Paige on the following offenses:

1.    Aggravated murder, in violation of Ohio Revised Code § 2903.01(A), with a firearm specification per Revised Code § 2941.145(A);

2.    Murder, in violation of Revised Code § 2903.02(A), with firearm specification per Revised Code § 2941.145(A);

3.    Two counts of tampering with evidence, in violation of Revised Code § 2921.12(A)(1)(B); and

4.    Obstructing justice, in violation of Revised Code § 2921.32(A)(5)(c)(4).

(ECF #7-1 at PageID 116-18).

Mr. Paige was appointed counsel on March 9, 2012. (*Id.* at PageID 119). On April 25, 2012, he provided a limited waiver of his right to speedy trial, requesting the court set his trial not later than September 24, 2012; on September 12, 2012, he provided a full waiver of his right to speedy trial. (*Id.* at PageID 120-21). On September 14, 2012, Mr. Paige filed a motion for relief from prejudicial joinder regarding his co-defendant, Ms. Fletcher, which the trial court denied. (*Id.* at PageID 122-32). The trial court also denied Mr. Paige's motion to suppress. (*Id.* at PageID 133-

46). Mr. Paige sought discovery sanctions, or, alternatively, a continuance of the trial, which the trial court also denied. (*Id.* at PageID 147-51). On March 3, 2014, the jury found Mr. Paige not guilty of aggravated murder but did not reach a unanimous verdict as to the remaining charges, so the trial court declared a mistrial. (*Id.* at PageID 152-53).

On October 28, 2014, the trial court dismissed Mr. Paige's complaint regarding the State's failure to transport him from the county jail to his mother's funeral services. (*Id.* at PageID 154-63). He filed a second Complaint and Motion for Default Judgment against the prosecutor, arguing for release because the jury found him not guilty of aggravated murder but could not reach verdict as to the lesser included offenses, to which the State responded with a motion to dismiss. (*Id.* at PageID 164-89). The trial court granted the motion to dismiss, finding Mr. Paige's claims without merit. (*Id.* at PageID 190). The prosecutor and Mr. Paige's attorney each requested leave to withdraw as counsel of record, which the court granted; Mr. Paige was appointed new counsel on December 2, 2014. (*Id.* at PageID 191-96).

On June 9, 2015, Mr. Paige filed a *pro se* motion for revocation of his speedy trial waiver (*Id.* at PageID 197-98), and a *pro se* motion to dismiss on double jeopardy grounds on February 3, 2015, which he re-filed on December 2, 2016. (*Id.* at PageID 199-216). The trial court overruled his motion on January 3, 2017. (*Id.* at PageID 217).

Mr. Paige's case regarding the lesser included offenses was called for trial on January 11, 2016, however, upon learning that Mr. Paige had filed a federal habeas corpus action in this Court (*See* ECF #7-1, PageID 230-92; *see also Paige v. State of Ohio*, Case No. 4:15-CV-2081, 2016 WL 4943017 (N.D. Ohio Sept. 16, 2016) (*Paige I*)), naming the prosecutor in the state case, the trial court declared a mistrial. (*Id.* at PageID 229). Mr. Paige continued filing *pro se* motions, including a

8

motion to recuse the trial court judge and a second motion revoking his speedy trial waiver. (*Id.* at PageID 218-25).

Following a jury trial, the jury returned a verdict on January 10, 2017 convicting Mr. Paige of murder and tampering with evidence, along with the related firearm specifications. (*Id.* at PageID 293-97). On January 24, 2017, the trial court sentenced Mr. Paige to 15 years to life on the murder count, with a mandatory 3 years' imprisonment on the firearm specification to run consecutively, and 3 years' imprisonment for tampering with evidence, to run concurrently to the previous charges, for a total of 18 years to life. (*Id.* at 298-99).

## C.    Direct Appeal

On February 21, 2017, Mr. Paige, through counsel, filed a Notice of Appeal in the Seventh District. (ECF #7-1, PageID 300-03). On February 23, 2017, Mr. Paige's trial counsel moved to withdraw, which was granted on March 8, 2017 and new counsel was appointed. (*Id.* at PageID 304-06). Mr. Paige filed a brief in support on February 22, 2018, raising the following assignments of error:

I.      Testimony relating to out of court, testimonial statements, violated Appellant's constitutional right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Art. I, Section 10 of the Ohio Constitution;

II.     The Appellant was denied a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10 and 16 of the Ohio Constitution, due to repeated instances of prosecutorial misconduct, including having the police vouch for the credibility and truthfulness of Jasmin Fletcher's out of court statements, for eliciting testimony regarding the out of court statements and for calling Fletcher's attorney and introducing evidence regarding her plea of guilty and the reasons for her assertion of her Fifth Amendment privilege;

III.    The Appellant received ineffective assistance of trial counsel when his trial attorney failed to object to numerous instances of prosecutorial misconduct

9

and the admission of clearly inadmissible hearsay statements and failed to file a motion to suppress statements made by Appellant, to his girlfriend, that were surreptitiously recorded by police;

IV.    The cumulative effect of numerous errors deprived Appellant of his right to a fair trial;

V.    Appellant was denied his constitutional and statutory right to a speedy trial and his right to the effective assistance of counsel when counsel failed to seek his discharge on speedy trial grounds.

(*Id.* at PageID 307-53) (cleaned up). The State opposed. (*Id.* at PageID 354-87). On March 25, 2019, the Seventh District affirmed the trial court. (*Id.* at PageID 388-428; *see also Paige*, 2019 WL 1400327).

Mr. Paige timely filed a notice of appeal to the Supreme Court of Ohio. (ECF #7-1, PageID 429-30). His memorandum in support of jurisdiction presented the following propositions of law:

I.    Due process and its equal protections of the law prohibits testimony relating to out of court, testimonial statements that results in an Appellant's Constitutional right to Confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution & Art. I § 10 of the Ohio Constitution;

II.    Due process of law & its equal protections prohibits denial of a right to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution, Art. I §§ 10 and 16 of the Ohio Constitution due to repeated instances of prosecutorial misconduct;

III.    The Sixth Amendment to the United States Constitution prohibits an Appellant's trial counsel ineffective assistance for failure to object to numerous instances of prosecutorial misconduct and the admission of clearly inadmissible hearsay statements including failure to file a motion to suppress statements made by an appellant, to his girlfriend, that was surreptitiously recorded by the police;

IV.    Due process of law and its equal protections under the United States Constitution prohibits cumulative effects of numerous errors that deprives Appellant of his right to a fair trial; and

V.  Due process of law and its equal protections prohibits the denial of an Appellant's Constitutional and statutory right to a speedy trial & his right to the effective assistance of trial counsel who failed to seek his discharge on speedy trial grounds.

(*Id.* at PageID 432) (cleaned up). On July 23, 2019, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 488; *see also State v. Paige*, 126 N.E.3d 1164 (Ohio 2019) (table)).

**D.  *Pro Se* Motion for Resentencing**

While his direct appeal was pending, on August 21, 2017, Mr. Paige filed a *pro se* motion for sentencing in the Mahoning County Court of Common Pleas. (ECF #7-1, PageID 489-506). The trial court dismissed the motion as untimely. (*Id.* at PageID 507). Mr. Paige then filed a *pro se* notice of appeal on October 2, 2017. (*Id.* at PageID 509). His brief in support raised the following assignments of error:

I.  Whether a jury's verdict for 'felony murder,' pursuant to: O.R.C. Section 2903.02(B) will lie in the absence of the mens rea component of an underlying predicate offense—of violence of the first or second degree; and

II.  Whether, and absent reversal and remand from an appellate court, a *trial court may review its former judgment (outside the provisions for arrested judgment) thereupon substantially changing a jury's verdict from a finding of guilt under: O.R.C. 2903.02(B) to 2903.02(A) in defendant's absence and without first vacating the former judgment and jury verdict.

(*Id.* at PageID 512). On June 29, 2018, the Seventh District affirmed in part, reversed in part, and remanded the matter for a resentencing hearing limited to the proper imposition of postrelease control and issuance of a new sentencing entry. (*Id.* at PageID 543-54; *see also State v. Paige*, No. 17 MA 0146, 2018 WL 3414256 (Ohio Ct. App. June 29, 2018) (*Paige II*)).

On December 10, 2018, the trial court held a limited resentencing hearing pursuant to Ohio Revised Code § 2929.191. (*Id.* at PageID 556-57). The court sentenced Mr. Paige to 15 years to life imprisonment on the murder charge, an additional 3 years for the firearm specification, and

11

3 years imprisonment for tampering with evidence. (*Id.*). The sentence on the murder charge was to run consecutively with the firearm specification, and the tampering with evidence charge to run concurrently to the murder charge, for a total of 18 years imprisonment. (*Id.*). The trial court added a discretionary period of postrelease control of up to 3 years. (*Id.*).

**E.    *Pro Se* Original Action in Mandamus**

While his direct appeal was pending, Mr. Paige filed a *pro se* mandamus action requesting the trial judge comply with the Seventh District's remand for resentencing. (*Id.* at PageID 558-63). The State moved to dismiss, which the Seventh District granted. (*Id.* at PageID 564-78; *see also State ex rel. Paige v. Sweeney*, No. 18 MA 0130, 2019 WL 6724553 (Ohio Ct. App. Dec. 5, 2019)).

**F.    Post-Conviction Relief**

On September 13, 2019, Mr. Paige filed an untimely Ohio Criminal Rule 26(B) application for reopening in the Seventh District, arguing as follows:

> Subsequent court appointed appellate counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution for failing to timely file an application for reopening Appellant Michael Paige's direct appeal pursuant to Appellate Rule 26(B)(5) based upon his first appellate counsel's ineffective assistance for failure to file a supplemental praecipe for additional transcripts that reflected his motion to dismiss on double jeopardy grounds that was denied at the trial court level in open court hearings of 2014 and 2016.

(ECF #7-1, PageID 579-612). The Seventh District denied Mr. Paige's application. (*Id.* at PageID 613-17; *see also State v. Paige*, No. 17 MA 0033, 2020 WL 707672 (Ohio Ct. App. Feb 7, 2020) (*Paige III*)). Mr. Paige appealed this decision, but the Supreme Court of Ohio again declined jurisdiction. (*Id.* at PageID 618-41; *see also State v. Paige*, 148 N.E.3d 584 Ohio 2020 (table)).

FEDERAL HABEAS CORPUS

Mr. Paige previously filed a habeas corpus petition in this Court on October 4, 2015. (*See* ECF #7-1, PageID 230-92; *see also Paige I.* In that petition, Mr. Paige asserted one ground of false imprisonment and double jeopardy, arguing that pending re-trials on the murder and tampering with evidence charges violated the Double Jeopardy clause. (*Id.*). This Court dismissed the petition without prejudice after determining that *Younger* abstention precluded a federal court from intervening in a pending state court proceeding. *Paige IV*, 2016 WL 4943017.

Mr. Paige filed the current petition on February 8, 2021, asserting one ground for relief: "Due Process and its equal protections violated on: Out of Court testimony; Prosecutorial Misconduct; Ineffective Assistance of Counsel; Cumulative Errors; Speedy Trial." (ECF #1 at PageID 6) (cleaned up). He expands on this elsewhere in the Petition with the following:

I.   Testimony relating to out of court, testimonial statements, violated Appellant's Constitutional right to Confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution & Art. I § 10 of the Ohio Constitution;

II.  The Appellant was denied a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution, Article I, Section 1, 10 and 16 of the Ohio Constitution due to repeated instances of prosecutorial misconduct, including having the police vouch for the credibility and truthfulness of Jasmin Fletcher's out of court statements, for eliciting testimony regarding the out of court statements and for calling Fletcher's attorney and introducing evidence regarding her plea of guilty and the reasons for her Fifth Amendment [*sic*].

III. The Appellant received ineffective assistance of trial counsel when his trial attorney failed to object to numerous instances of prosecutorial misconduct and the admission of clearly inadmissible hearsay statements and failed to file a motion to suppress statements made by appellant, to his girlfriend, that were surreptitiously recorded by police.

IV.  The cumulative effect of numerous errors deprived Appellant of his right to a fair trial; and

V. Appellant was denied his Constitutional and statutory right to a speedy trial and his right to the effective assistance of counsel who failed to seek his discharge on speedy trial grounds.

(*Id.* at PageID 17) (cleaned up). He requests this Court order his immediate release, to have the Attorney General turn over all transcripts relating to the double jeopardy issue, and upon findings of facts, issue the writ of habeas corpus immediately. (*Id.* at PageID 16).

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Paige's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the

time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision involves an unreasonable application of the Court's precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

15

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18.

Under federal law, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

 The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de*

*novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. Claims there were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not cognizable on federal habeas review. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004).

**Exhaustion of Available State Court Remedies**. A court may not grant a petition for habeas corpus unless it appears the petitioner has exhausted available state court remedies, state corrective process is unavailable, or circumstances exist rendering such state process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1). Typically, the exhaustion requirement is satisfied when the petitioner fairly presents all claims to the highest court in the state where petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim is fairly presented when both the factual and legal bases for the claim have been introduced to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.

2006). In contrast, where state court remedies are no longer available, procedural default (discussed more fully below), rather than exhaustion, applies. *Id.*

**Procedural Default**. Absent a petitioner demonstrating either cause and prejudice or that failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

There are two avenues by which a petitioner's claim may be procedurally defaulted. *Id.* First, procedural default occurs if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether a petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Second, a claim may be procedurally defaulted when the petitioner fails to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas

18

petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. Although the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims barring federal court review. *Williams*, 460 F.3d at 806; *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) ("When [a state prisoner] has failed to [first present that claim to the state court in accordance with state procedures], and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'").

In Ohio, claims must be raised on direct appeal, if possible, or res judicata bars their litigation in subsequent proceedings. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (citing *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967)). Therefore, a petitioner is not entitled to raise claims in post-conviction proceedings that could have been raised on direct appeal. *Engle*, 456 U.S. at 125 n.28. Consequently, if an Ohio petitioner fails to raise a claim on direct appeal that could have been raised at that time, the claim is procedurally defaulted. *Id.*

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749. Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed

argumentation, are deemed waived.") (quotation omitted)). A finding of cause and prejudice does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

A showing of cause for the default requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Furthermore, neither a petitioner's pro se status nor his ignorance of the law and procedural filing requirements are enough to establish cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Futility cannot constitute cause for the procedural default of a claim for failure to raise a claim on direct review if it means simply that a claim was "unacceptable to that particular court at that particular time." *Engle*, 456 U.S. at 130, n.35. Ineffective assistance of counsel may serve as cause to excuse a procedural default, but the ineffective assistance claim itself must not be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Attorney error does not constitute "cause" unless it rises to the level of a constitutional violation of the right to counsel under *Strickland*. *Murray*, 477 U.S. at 488.

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice; rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. There is no

prejudice where the petitioner does not show a reasonable probability of a different verdict. *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be supported by new reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial and is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

**State Law Claims Not Cognizable on Federal Habeas Review.** The District Court will not have jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."). Moreover, merely asserting that a state law error violates the Federal Constitution is not sufficient

21

to justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).

Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

DISCUSSION AND ANALYSIS

I. **Mr. Paige's petition is untimely.**

The State first argues Mr. Paige's petition is untimely and thus barred by AEDPA's statute of limitations, and neither statutory nor equitable tolling apply to permit review of his claims.

(ECF #7, PageID 58-66). Mr. Paige acknowledges his late filing but maintains the one-year statute of limitations should not bar his petition on the following basis:

> Due to COVID-19 Whereas, on March 27,2020, the Governor of Ohio signed into law Am.Sub.H.B. 197, which immediately tolled, retroactive to march 9, 2020, all statutes of limitation, time limitations, and deadlines in the Ohio Revised Code and the Ohio Administrative Code until the expiration of Executive Order 2020-01D or July 30, 2020. (Order from the Ohio Supreme Court) (March 27, 2020).

(ECF #1, PageID 14). In his Traverse, he says statutory tolling applied to render the petition timely, equitable tolling applies, and his petition relates back to his earlier petition to this court, and because this filing is within one year of the pendency of his Rule 26(B) motion. (ECF #13, PageID 1185-95). For the reasons that follow, I find Mr. Paige's petition is untimely and therefore recommend it be dismissed.

Under 28 U.S.C. § 2244(d), a one-year statute of limitations applies to applications for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. *See Duncan v. Walker*, 533 U.S. 167, 179 (2001) (noting that the one-year limitation period in § 2244(d)(1) meets the interest in the finality of state court judgments). The limitations period is not jurisdictional; rather, it is an affirmative defense that the responding party must raise in its first responsive pleading. *Day v. McDonough*, 547 U.S. 198, 205 (2006); *see also Scott v. Collins*, 286 F.3d 923, 927-28 (6th Cir. 2002). Though not jurisdictional, when the State asserts it and the petition is late, the district court should dismiss the case. *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009); *see also McCray v. Vasbinder*, 499 F.3d 568, 577 (6th Cir. 2007) (reversing order granting habeas relief because the "gateway requirements" for excusing a time-barred petition — i.e., equitable tolling and actual innocence — had not been satisfied).

AEDPA's statute of limitations period runs from the latest of four dates:

(A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). AEDPA sets strict filing deadlines to promote the finality of convictions and curb dilatory tactics. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

For petitioners who pursue direct review to the state's Supreme Court, a judgment becomes final for purposes of § 2244(d)(1)(A) when a timely-filed petition for certiorari is denied or the time to file a certiorari petition with the United States Supreme Court expires. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). But § 2244(d)(2) does not toll the limitations period during the filing of a petition for certiorari to the United States Supreme Court because such a petition is federal and therefore "not a part of a 'State's post-conviction procedures.'" *Id.* at 337 (quoting § 2244(d)(2)).

Here, the Supreme Court of Ohio declined jurisdiction of Mr. Paige's direct appeal on July 23, 2019. *State v. Paige*, 126 N.E.3d 1164 (Ohio 2019) (table). Mr. Paige had 90 days to file for certiorari, *i.e.*, until October 21, 2019, but did not do so; therefore, the AEDPA statute of limitations clock began to run on October 22, 2019. Thus, absent tolling, Mr. Paige's filing window closed on October 21, 2020. He did not file his ptition in this Court until February 8, 2021, rendering his petition untimely by 110 days. (ECF #1).

A.      **Statutory Tolling**

Under 28 U.S.C. § 2244(d)(2), the limitations period is tolled while a properly filed

application for state post-conviction relief or other collateral review with respect to the pertinent

judgment or claim remains pending. A postconviction petition that is untimely under state law is

not "properly filed." *Pace v. DiGuglielmo,* 544 U.S. 408, 414 (2005).  An application is "'filed,' . . .

when it is delivered to, and accepted by, the appropriate court officer for placement into the

official record," but "is '*properly* filed' when its delivery and acceptance are in compliance with the

applicable laws and rules governing filings," including time limits for its delivery. *Artuz v. Bennett*,

531 U.S. 4, 8 (2000) (emphasis in original).

On September 13, 2019, before the one-year statute of limitations ran, Mr. Paige filed an

untimely Ohio Appellate Rule 26(B) application for reopening the direct appeal in the Seventh

District, setting forth in the caption that it was a "delayed application for reopening the direct

appeal pursuant to Appellate Rule 26(B)(1)(b)." (ECF #7-1, PageID 579). Rule 26(B)(1) of the

Ohio Rules of Appellate Procedure requires that "[a]n application for reopening shall be filed in

the court of appeals where the appeal was decided within ninety days from journalization of the

appellate judgment unless the applicant shows good cause for filing at a later time." The Seventh

District decided Mr. Paige's direct appeal on March 26, 2019, but he did not file his Rule 26(B)

application until September 13, 2019, nearly three months late; the Seventh District denied the

Rule 26(B) motion, finding no good cause for the delayed filing. (*See* ECF #7-1 at PageID 613-17;

*see also Paige III*, 2020 WL 707672). Thus, because Mr. Paige's Rule 26(B) application was untimely

and the Seventh District did not find good cause, the application was not "properly filed" and thus

does not statutorily toll AEDPA's limitations period. *See Pace*, 544 U.S. at 414; *Artuz*, 531 U.S. at

8; *see also Davenport v. Fender*, 2023 WL 1785492, at *9 (N.D. Ohio Jan. 5, 2023), *report and recommendation adopted*, *Davenport v. Fender*, 2023 WL 178121 (N.D. Ohio Feb. 6, 2023) (finding statutory tolling did not apply to delayed Rule 26(B) motion).

Tolling pauses a clock that has not yet fully run; it does not "revive the limitations period" or "restart the clock." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003). Unless equitable tolling applies, Mr. Paige's petition is untimely.

### B.    Equitable Tolling

AEDPA's statute of limitations is not "an inflexible rule requiring dismissal whenever its clock has run" and is "subject to equitable tolling." *Holland v. Florida*, 560 U.S. 631, 645-46, 649 (2010) (internal quotations omitted). A habeas petitioner is entitled to equitable tolling only if he shows (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Holland*, 560 U.S. at 649.

Mr. Paige claims he is entitled to equitable tolling. He asserts that his numerous filings in state court, including the delayed Rule 26(B) petition, demonstrate "he was diligent in pursuing his rights and extraordinary circumstances beyond his control, even with due diligence, unavoidably delayed the filing of his § 2254 habeas corpus petition." (ECF #13, PageID 1188). Although Mr. Paige may have demonstrated his reasonable diligence through these state filings, (*see id* at PageID 1188-91), he does not significantly expand upon what circumstances beyond his control prevented his timely filing of this action; he merely states "circumstances beyond [his] control ha[ve] hindered and impeded him from obtaining the transcripts of proceedings required to receive an adequate review of the trial court's decision(s) denying his motions to dismiss based on double jeopardy violations" (*id.* at PageID 1191). Although it may be true that he was impeded

26

in receiving the transcripts of proceedings for his state review, that issue does not demonstrate the type of extraordinary circumstances that qualify for equitable tolling.

Mr. Paige also raised the COVID-19 pandemic as a factor delaying the timeliness of his filing in this Court. (ECF #1, PageID 14). That argument asserts "the Governor of Ohio . . . tolled, retroactive to March 9, 2020, all statutes of limitation, time limitations and deadlines in the Ohio Revised Code and the Ohio Administrative Code until the expiration of Executive Order 2020-01D or July 30, 2020." (*Id.*). But the *Ohio* governor's tolling of state statutes of limitations does not toll the *federal* AEDPA statute of limitations. Thus, Mr. Paige's allegations regarding the COVID-19 pandemic do not trigger equitable tolling.

To the extent Mr. Paige alleges his ignorance of the law and procedure constitutes an extraordinary circumstance, he is mistaken. The Sixth Circuit has repeatedly held that "ignorance of the law alone is not sufficient to warrant equitable tolling." *See Rose v. Dole,* 945 F.2d 1331, 1335 (6th Cir. 1991); *Allen v. Bell,* 250 Fed. App'x 713, 716 (6th Cir. 2007); *Taylor v. Palmer,* 623 Fed. App'x 783, 789-90 (6th Cir. 2015); *see also Keeling v. Warden, Lebanon Correctional Inst.,* 673 F.3d 452, 464 (6th Cir. 2012) ("Finally, we note that Keeling's *pro se* status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance and to excuse his late filing."). The record does not support Mr. Paige's assertion that he was reasonably diligent in pursuing his claims.

After considering Mr. Paige's arguments and the applicable law, I find Mr. Paige's untimely petition is not saved by equitable tolling. Mr. Paige has not shown reasonable diligence in pursuing his claims and has not identified an extraordinary circumstance that prevented him from timely filing his federal habeas petition; therefore, he is not entitled to equitable tolling.

## C.     Relation Back

Mr. Paige also argues his petition is merely a supplemental petition relating back to his earlier petition in this Court. (ECF #13, PageID 1194-95). He argues that the claims raised in this petition "relate back to the petition originally filed on the 'operative facts' of this case in Case NO. 4:15-cv-2081 on October 7, 2015" and "[b]ecause the first petition was never deemed filed untimely under AEDPA but was required to exhaust the Double Jeopardy claim in state court . . . the claims in the current habeas corpus petition arise of the same 'conduct, transaction, or occurrence,' they should be considered timely filed." (*Id.* at PageID 1195).

Mr. Paige is correct that an amendment to a petition may be considered timely filed if it relates back to the original petition, *i.e.*, if the claims arise out of the same conduct, transaction, or occurrence. "Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings 'ar[i]se out of the conduct, transaction, or occurrence.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Fed. R. Civ. P. 15(c)(2)). But relation back is limited by AEDPA and federal habeas corpus rules of procedure. *See id.* at 655-67. Habeas courts "may apply the Federal Rules of Civil Procedure only 'to the extent that they are not inconsistent with any statutory provisions or [the habeas] rules.'" *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016).

An overly broad relation-back doctrine may contravene Congress's intent in enacting AEDPA "to advance the finality of criminal convictions." *See Mayle*, 545 U.S. at 661. Thus, the ability to amend a habeas petition is more restrictive than in other civil cases; it must specifically relate back to the original petition to avoid imposition of AEDPA's one-year limitation. *Id.* at 664. "If claims asserted after the one-year period could be revived simply because they relate to the same

28

trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Id.* at 662.

Despite Mr. Paige's assertion that this is an amended petition, it is not. This is a second habeas filing, made over five years after the first filing, and similarly years after it was dismissed without prejudice to refile upon exhaustion of his state court claims. An amendment under Rule 15 may not relate back to a dismissed petition. *Watkins v. Stephenson*, 57 F.4th 576, 580 (6th Cir. 2023), *cert. denied sub nom. Watkins v. Chapman*, 144 S. Ct. 222 (2023). An amendment may only "relate[] back to the date of the *original* pleading[.]" Fed. R. Civ. P. 15(c)(1). An "original pleading" is therefore "the initial complaint (or petition) in the case in which the amendment occurs." *Watkins*, 57 F.4th at 580 (citing *Mayle*, 545 U.S. at 655). The Sixth Circuit and other Circuit Courts interpret Rule 15 to bar petitioners from relying on the date of a dismissed petition to satisfy AEDPA's one-year statute of limitations. *Id.* at 580 (collecting cases). Because Mr. Paige's current petition does not relate back to his 2015 petition, it remains untimely.

D.    **Actual Innocence Exception**

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court held that a petitioner who asserts a credible claim of actual innocence can "avoid a procedural bar to the consideration of the merits of his constitutional claims." *Id.* at 327. Based on *Schlup*, the Sixth Circuit has held a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of AEDPA's statute of limitations. *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005) ("where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims").

The exception is rare and only applied in extraordinary cases. *See Schlup*, 513 U.S. at 321; *see also Souter*, 395 F.3d at 590.

To demonstrate a credible claim for actual innocence justifying consideration of a time-barred habeas claim, a petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup*, 531 U.S. at 316. The threshold inquiry is whether "new facts raise sufficient doubt about [the petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317. The petitioner's evidence must include "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Although the examples of new evidence cited in *Schlup* "were not meant to be an exhaustive list of everything upon which an actual innocence claim may be based," *Souter*, 395 F.3d at 595 n.8, "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted).

If a petitioner presents new reliable evidence to support a credible claim of actual innocence, the federal court must consider the fully developed record and the new evidence. *Schlup*, 531 U.S. at 329. "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 531 U.S. at 329). After reviewing all the evidence, if "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," the petitioner is entitled to a review of the merits of his underlying constitutional claim. *Schlup*, 531 U.S. at 327.

The standard is difficult to meet. Supreme Court and Sixth Circuit case law provide illustrative examples of the amount and kind of evidence necessary to meet this high burden. In *Souter,* the Sixth Circuit held the petitioner met the actual innocence standard where the petitioner presented compelling proof that a bottle – the only direct evidence linking him to the death – could not have caused the victim's injuries. *See* 395 F.3d at 596-97. Notably, the Sixth Circuit relied on evidence in the form of affidavits from trial witnesses who retreated from or recanted their original testimony, a report from a forensic scientist who examined the bottle and autopsy photos and found no sharp edges or protuberances that could have caused the wounds shown in the photos, and photos of the victim's clothing that were unavailable at trial. *Id.* at 590-92. The victim's clothing, allegedly covered in blood, contradicted the State's argument that the absence of blood on Mr. Souter was consistent with the absence of blood on the victim. *Id.* at 592. This evidence, taken together, chipped away at the slim circumstantial evidence on which Mr. Souter was convicted. *Id.*

In *House,* the Supreme Court concluded the petitioner satisfied the standard by putting forth evidence that called into question the central forensic proof (blood and semen) that connected the petitioner to the crime and substantial evidence pointing to a different suspect. *See* 547 U.S. at 540-54. The Court noted it was a close call, acknowledging some aspects of the state's evidence still supported an inference of guilt, but the existence of evidence undermining the forensic proof, and the petitioner's production of evidence from multiple sources suggesting that the victim's husband regularly abused the victim, were sufficient for the Court to conclude that, had the jury heard all the conflicting testimony, it was more likely than not that no reasonable

juror viewing the record as a whole would have found the petitioner guilty beyond a reasonable doubt. *Id.* at 553-54.

Mr. Paige does not claim actual innocence in his argument to support equitable tolling. (*See* ECF #13). Because Mr. Paige has not presented any evidence supporting a credible claim of actual innocence, he cannot satisfy the demanding standard necessary to support equitable tolling of his untimely petition.

In light of the foregoing, I conclude Mr. Paige's petition is untimely. I recommend the District Court **DISMISS** the petition in its entirety.

## II. Even if tolling is available to him, Mr. Paige's petition otherwise fails.

If the District Court determines Mr. Paige's petition is timely, I recommend it **DISMISS** Grounds Two and Five as procedurally defaulted, and **DISMISS** Ground Four as not cognizable, and **DENY** Grounds One and Three as meritless.

Initially, I must determine what grounds for relief are properly asserted in the petition. In the body of the petition, Mr. Paige presents one omnibus ground for relief: "Due process and its equal protections violated on; out of court testimony; prosecutorial misconduct; ineffective assistance of counsel; cumulative errors; speedy trial. (ECF #1, PageID 6) (cleaned up). But in his briefing, he lists five grounds that correspond to the five assignments of error in his direct appeal to the Seventh District. (*Id.* at PageID 17; *see also Paige*, 2019 WL 1400327). He also lists the five Propositions of Law presented to the Ohio Supreme Court in his direct appeal (ECF #1, PageID 18). I note that issues raised in his omnibus Ground One roughly correspond to the issues raised in his direct appeal. (*Compare* ECF #1, PageID 6 *with id.* at 17-18). Also included in his petition's brief, Mr. Paige lists the assignments of error raised in his Rule 26(B) motion. (*Id.* at PageID 22). In

his Traverse, he also includes argument regarding the double jeopardy issue raised in his dismissed habeas petition to this Court. (ECF #13, PageID 1191-95).

Unrepresented parties' filings are entitled to liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) ("we hold [*pro se* complaints] to less stringent standards than formal pleadings drafted by lawyers."). As such, courts must engage in "active interpretation in some cases to construe a pro se petition to encompass any allegation stating federal relief." *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) (quotation marks omitted). At the same time, the principles requiring liberal construction of unrepresented filings are not without their limits. *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001); *see also O'Connor v. United States*, No. 4:21-CV-1287, 2021 WL 5113225, at *1 (N.D. Ohio Nov. 3, 2021) (collecting cases). A court oversteps its bounds by "conjur[ing] allegations on a litigant's behalf," *Erwin*, 22 F. App'x at 580, because petitioners "are not automatically entitled to take every case to trial." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (quoting *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)). A petitioner must still meet basic pleading standards, including correctly identifying his own claims before the court. *Martin*, 391 F.3d at 714.

Here, I determine that the grounds for relief Mr. Paige identifies in his petition are those included in his omnibus Ground One and that correspond to the issues raised in his direct appeal. I find he has not sufficiently identified the other issues to permit their inclusion in my review and to do so would stretch liberal construction beyond permissible limits. Although he includes the two issues from his Rule 26(B) motion, this appears to be labeled as a response disclosing his earlier state court filings. (*Compare* ECF #1, PageID 22-26 *with id.* at PageID 4-5). And because the present petition does not relate back to his 2015 federal habeas corpus filing, his earlier double

33

jeopardy claims are not revived here. Therefore, I address the five-part omnibus Ground One in turn below.

### A.    Ground One: Out of Court Testimony

As Ground One, Mr. Paige asserts that "Testimony relating to out of court, testimonial statements, violated [his] right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution & Art. I § 10 of the Ohio Constitution." (ECF #1, PageID 17). Specifically, Mr. Paige argues that the testimony of Det./Sgts. Spotleson and Martin regarding Ms. Fletcher, combined with Ms. Fletcher's invocation of her Fifth Amendment privilege at trial, violated his Sixth Amendment Confrontation Clause rights. (ECF #13, PageID 1203-04). He further argues it was objectively unreasonable for the Seventh District to find this testimony harmless, and that, had the prejudicial testimony been omitted, the "facts and evidence are not evenly balanced, but, in fact, weigh more heavily in his favor of not being guilty of committing murder." (*Id.*).

The State argues this Ground was correctly determined by the state appellate court and is therefore meritless. (ECF #7, PageID 81-90). I agree this Ground is meritless and recommend the District Court **DENY** any relief on this basis.

The Confrontation Clause of the Sixth Amendment states "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Its primary purpose is to prevent out-of-court statements from being used against a defendant in lieu of in-court testimony subject to the scrutiny of cross-examination. *Crawford v. Washington*, 541 U.S. 36, 50 (2004).

The Confrontation Clause is subject to a harmless-error analysis, requiring "pro[of] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 680, 684 (1986) (collecting cases applying the *Chapman* harmless-error standard to Confrontation Clause issues). As such, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 681 (collecting cases).

Whether the failure to cross-examine is harmless depends on multiple factors unique to the particulars of each case, including, "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 684.

Ultimately, a habeas petitioner must show the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (internal quotation and marks omitted). Where a state court has ruled on the merits of a state prisoner's claim – and there is no question that a harmless-error analysis is a determination on the merits, *Davis v. Ayala*, 576 U.S. 257, 269 (2015) – the federal habeas court must apply both the *Brecht* test as well as evaluating the state court's decision under AEDPA before it may grant relief. *Brown v. Davenport*, 596 U.S. 118, 122 (2022). I do so here.

As to the state court's decision, in reviewing the corresponding assignment of error, the Seventh District determined that, in view of the particulars of his case, the hearsay admission of Ms. Fletcher's statements was harmless beyond a reasonable doubt because the other evidence

presented – including Mr. Paige's own videotaped confession, testimony of other witnesses, and the non-hearsay testimony of Det./Sgts. Spotleson and Martin – overwhelmingly proved his guilt. *Paige*, 2019 WL 1400327 at *9. The Seventh District analyzed the issue as follows:

ASSIGNMENT OF ERROR NO. 1

> Testimony relating to out of court, testimonial statements, violated Appellant's constitutional right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Art. I, Section 10 of the Ohio Constitution.

[¶21] Appellant contends the testimony of Det./Sgts. Spotleson and Martin regarding the statements Fletcher made to them during police interviews constituted testimonial hearsay in violation of his right to confront witnesses guaranteed by the Sixth Amendment Confrontation Clause.

[¶22] The state contends the testimony of Det./Sgts. Spotleson and Martin was for the purpose of explaining their conduct during the investigatory process and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

[¶23] The trial court typically has broad discretion in admitting or excluding evidence. However, a *de novo* standard of review is applied to a claim that a criminal defendant's rights have been violated under the Confrontation Clause.

[¶24] Pursuant to the Sixth Amendment Confrontation Clause, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Testimonial statements of a non-testifying witness are inadmissible unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination of the witness. In *Crawford,* the Supreme Court declined to provide a comprehensive definition of "testimonial," but indicated that the term includes, at a minimum, prior testimony at a preliminary hearing, before a grand jury, at a former trial, and statements made during police interrogations.

[¶25] In *Davis v. Washington,* the Supreme Court held that statements are nontestimonial for Confrontation Clause purposes when made in the course of a police interrogation under such circumstances that indicate objectively the primary purpose of the interrogation is to enable police to address an ongoing emergency. Testimonial statements occur when the circumstances objectively indicate that there is no ongoing emergency and the primary purpose of the interrogation is to establish or prove past events that are potentially relevant to a future criminal prosecution.

[¶26] Hence, we must distinguish between police interrogations that are part of an ongoing emergency and interrogations related to past criminal conduct and which serve only to investigate potential criminal prosecution. Appellant claims the testimony of two witnesses give rise to Confrontation Clause issues: the direct testimony of Det./Sgt. Spotleson and the direct testimony of Det./Sgt. Martin. Det./Sgt. Spotleson was lead investigator on the case and was assisted by Det./Sgt. Martin. Both were present during the interviews of Appellant and Fletcher.

[¶27] Det./Sgt. Spotleson provided most of the testimony to which Appellant objects. As noted above, during direct examination Det./Sgt. Spotleson was asked a number of questions regarding statements Fletcher made during her two interviews with police. At the outset it should be noted that, although the first interview was conducted on the same day as the incident, albeit several hours later, and the second interview was conducted the following morning, neither interview can be characterized as addressing an emergency situation. Fletcher was a person of interest during her first interview. At the conclusion of Fletcher's first interview, Appellant was also a person of interest. At the time of the second interview, both Fletcher and Appellant had been placed under arrest. In the absence of an ongoing emergency, the statements made by Fletcher to police were made under circumstances that objectively indicate there was "no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

[¶28] The state contends the testimony of the detectives was "offered to explain an officer's conduct while investigating a crime" and thus, are not hearsay and do not violate the Confrontation Clause. We do not find this reasoning persuasive, particularly when considering the testimony elicited from Det./Sgt. Spotleson regarding his first interview of Fletcher:

Q And you interviewed [Fletcher]?
A Yes
Q Did she tell you that she was present when this occurred?
A Yes
Q Did she identify a second person of interest?
A Yes
Q And who was that?
A Michael Paige

[¶29] In *State v. Ricks*, the Ohio Supreme Court held that an officer's testimony regarding the out-of-court statements of an alleged accomplice identifying the defendant as the assailant violated the Confrontation Clause when the accomplice did not testify at trial. In *Ricks*, the officer testified regarding the process undertaken to obtain a photograph of the defendant as well as the act of presenting that

photograph to the alleged accomplice during an interrogation of that accomplice. Following this explanation, the officer testified:

Q. Once again, [Officer], when you showed [the alleged accomplice] this photo, after obtaining it from Georgia, did he make identification?
A. Yes.
Q. What did he say?
A. He says that's Peanut.

[¶30] In contrast, in *State v. Johnson,* the investigating officer interviewed a witness named Wright. Wright invoked his Fifth Amendment privilege at the defendant's trial. During defendant's trial, the officer testified that Wright had given her a description of both the vehicle involved in the shooting and the shooter. During this testimony the officer did not repeat those descriptions. In fact, "[w]hen Officer Johnson began to offer hearsay testimony, the state and the court reminder her not to repeat what other people may have said." The Seventh District held that since the officer did not testify as to the exact statements of Wright, there was no Confrontation Clause violation. The state also presented the testimony of the decedent's mother, Andrea, who had spoken to Wright about her son's death:

[STATE]: Why don't you tell us about the following day. Did you meet with [Wright]?
[ANDREA]: Yeah, the following day I guess he wanted to tell me who—
[DEFENSE COUNSEL]: Objection.
THE COURT: Well, why don't we caution [Andrea]. One of the rules in court is that you can't tell us what somebody else said.
[STATE]: We went over the rules a little bit before your testimony * * * about hearsay. You can't talk about what someone else told you, right? So I don't want you to say the words that [Wright] said, right?
[ANDREA]: Right
* * *
[STATE]: Did [Wright] tell you what happened?
[ANDREA]: Yes.
[STATE]: And without telling us what he said, did he tell you who had done it?
[ANDREA]: Yes.
[STATE]: Did he give you one name or more than one?
[ANDREA]: He gave me [the] first and last name * * * of one person.
[STATE]: Again, [Andrea], I don't want to go into specifics about what he said, but did he tell you how it happened and how [Ayers] died?
[ANDREA]: Yes.

[¶31] The Seventh District likewise held in regard to this testimony that since the actual information the witness had learned from Wright was not disclosed during testimony, the testimony was not offered to prove the circumstances of the decedent's

death but only to explain how the case unfolded. Hence, it was not testimonial hearsay.

[¶32] The line of questioning in the instant case more closely reflects the situation found in *Ricks*, and not *Johnson*, as Appellee claims. Rather than testifying only to Det./Sgt. Spotleson's "conduct while investigating a crime," the testimony goes further, eliciting testimony about the identification of Appellant by his codefendant. When testifying as to Fletcher's first interview, not only did Det./Sgt. Spotleson relate the questions he asked her, he testified that she gave the officer Appellant's name as a person involved in the crime. Regarding Fletcher's second interview, after she was shown the video of Appellant's interview implicating her as the shooter, Det./Sgt. Spotleson testified that Fletcher told him where she was standing, where the victim was standing and where the shooter was standing. He repeated those exact locations. He also testified that Fletcher told him Blake did not have a gun and that she did not feel threatened by Blake during the incident. At the end of his questioning, Det./Sgt. Spotleson was asked whether he had a suspect at the conclusion of Fletcher's interview. He responded in the affirmative and named Appellant. This testimony goes beyond the process used in the investigation. It goes to the heart of the fact at issue, the name of the shooter. Although not as direct as the testimony revealed as a result of the first interview, and framed in a manner that appears to explain police conduct during an investigation, it is clear that Det./Sgt. Spotleson's testimony was offered to place before the jury Fletcher's statements implicating Appellant as the shooter, and not simply to demonstrate how the investigation was conducted.

[¶33] Det./Sgt. Martin testified as a witness for Appellant. He was called to testify regarding the search of Appellant's residence, which failed to elicit an actual weapon, as well as to Appellant's gun powder residue test results, which were negative. On cross-examination, the state asked Det./Sgt. Martin about Appellant's admission that he shot Blake and whether Appellant's admission mirrored what Fletcher said about the crime scene:

Q He also told you that he killed Munir Blake, correct?
A Correct.
Q And did [Fletcher] corroborate that?
A Yes.
Q He told you that [Blake] was standing that doorway—and just so you know, the jury went to the scene, so they have seen that. The doorway going from the kitchen onto that landing, stairway landing, he also told you that [Blake] was standing in that doorway, correct?
A Correct.
Q And did [Fletcher] corroborate that?
A Yes.

Q He also told you that [Fletcher] would have been pretty much facing [Blake], correct?
A Correct.
Q Standing on that landing, basically pretty much straight across from each other?
A He described face to face.
Q Okay. And [Fletcher] also corroborated that, correct?
A Correct.
* * *
Q To the best of your knowledge, did [Fletcher] ever say that she shot and killed [Blake]?
A No.

[¶34] Again, rather than testifying only to Det./Sgt. Martin's "conduct while investigating a crime" the testimony goes further and seeks to place before the jury that Fletcher corroborated Appellant's admission. As Fletcher did not testify, the state used the officer's testimony to put Fletcher's statements into evidence. Under the primary purpose test set forth in *Crawford* and its progeny, the statements made by Fletcher during her police interrogations are testimonial in nature. The testimony given by both officers goes beyond their investigatory conduct and procedure and instead appears to be an attempt to prove the truth of the matter asserted: to identify Appellant as the assailant and to bolster Appellant's admission. As Fletcher did not testify at trial and there was no previous opportunity for Appellant to cross-examination Fletcher, this testimony was inadmissible hearsay in violation of the Confrontation Clause.

[¶35] Once we determine that the testimony was admitted erroneously, our inquiry does not end here, however. We must next look at whether Appellant was harmed by this error. In *Ricks,* the Supreme Court held that statements made by the officer were unfairly prejudicial and the cited purpose for the testimony, police investigatory procedure, was pretextual. The *Ricks* Court found the out-of-court statements "exceptionally damaging" because the declarant was the other suspect in the murder. As most of the state's evidence related to the other suspect's involvement in the crime, the state's case, then, "revolved" around the declarant. The *Ricks* Court concluded the Confrontation Clause violation was not harmless beyond a reasonable doubt as there existed a reasonable possibility that the testimony of the officer contributed to the defendant's conviction. Whether a Confrontation Clause violation is harmless beyond a reasonable doubt involves not merely an inquiry into the sufficiency of the remaining evidence, absent the erroneously admitted evidence, but whether there is a reasonable possibility that the violating evidence might have contributed to the resulting conviction.

[¶36] Regarding harmless error, Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In order to determine whether substantial rights were affected, we must evaluate

whether there was prejudice to the defendant. A court is required to review the impact of the offending evidence on the overall verdict and compare it to the strength of the other remaining evidence.

[¶37] To determine "whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence." Moreover, "the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction."

[¶38] The fact that most concerned the *Ricks* Court was that the declarant who was the subject of the officer's testimony was an accomplice, and the state's evidence centered predominately around the accomplice. In the instant case, Fletcher is also a codefendant. The same concern over utilizing the testimonial statements of a codefendant is theoretically applicable here. Both investigating detectives testified about statements made by Fletcher which placed Appellant at the scene as the shooter. In urging prejudice under the plain error standard, Appellant alleges that although he confessed to shooting Blake, the record reflects that he told several different accounts of the events that transpired. The testimony of Det./Sgts. Spotleson and Martin had the effect of bolstering his admission, by corroborating the details of the version of events (including Appellant's own) that reflect Appellant's guilt.

[¶39] While we are troubled by the admission of the testimony of Det./Sgts. Spotleson and Martin because the testimony went beyond what is allowable by law, the troubling nature of the testimony is considerably lessened when considering the remaining evidence presented to the jury. Excising the testimony of Det./Sgts. Spotleson and Martin, which we are required to do, this record reveals that the jury had before it overwhelming evidence of Appellant's guilt. First and foremost, the jury was shown the videotaped admission of the shooting by Appellant, where he provided a detailed description of the murder scene and of the events in his own words. His description of the incident was corroborated by the testimony of Officer Anthony Marzullo who investigated the scene. It was further corroborated by Dr. Ohr, the medical examiner who not only investigated at the scene but performed the autopsy on Blake. Further, the jury was taken to the scene of the shooting in order to better visualize the testimony presented regarding the placement of the shooter in relation to the gunshot wounds suffered by Blake. We cannot discount the inherent significance of the video confession, where the jury was able to see Appellant confessing to the crime and describing the scene in detail. Nor can we second-guess the jury's credibility determinations in that regard. The erroneous testimony regarding Fletcher's statements was merely cumulative to testimony already presented by Dr. Ohr, Officer Marzullo and, most notably, Appellant himself.

[¶40] On review of this record, we conclude that, in view of the particular facts and circumstances of this case, any error in the hearsay admission of Fletcher's statements was harmless beyond a reasonable doubt. We stress that we reach this conclusion based on the other overwhelming evidence of Appellant's guilt, most notably Appellant's own detailed videotaped confession, but also the testimony of the other witnesses, as well as the remaining relevant testimony of both Det./Sgts. Spotleson and Martin. Based on this record, the cumulative nature of the officers' testimony was neither impactful nor prejudicial. Excising that testimony and considering the remaining evidence presented, the state proved beyond a reasonable doubt that Appellant was the shooter. We caution that it is the nature and amount of other relevant evidence that clearly impacts our review of this matter. Absent the overwhelming evidence of guilt present in this record, the testimonial hearsay evidence would most likely not be harmless. Based on the record in this matter, Appellant's first assignment of error is without merit and is overruled.

*Paige*, 2019 WL 1400327, at *4-9 (citations omitted).

The Seventh District's decision was not contrary to, nor an unreasonable application of, clearly established Federal law, and did not unreasonably determine the facts in light of the evidence presented in the trial court. 28 U.S.C. § 2254(d). The Seventh District followed *Chapman*, as well as its own Ohio precedents, to determine on direct review whether the Confrontation Clause violation was harmless. *See Paige*, 2019 WL 1400327, at *4-9. It looked to the sufficiency of the remaining evidence, absent the erroneously admitted evidence, and also examined whether admission of that evidence might have contributed to the resulting conviction. In the end, while it determined the evidence should not have been admitted, the Seventh District concluded the jury had before it other overwhelming evidence of Mr. Paige's guilt. *See id.* at *8. As a result, the erroneously admitted testimony was cumulative and the State proved Mr. Paige's guilt beyond a reasonable doubt. *Id.* at *9. Applying AEDPA deference, as is appropriate, I see no error in the Seventh District's analysis that would warrant relief from this Court.

Because AEDPA deference renders a denial of Ground One appropriate, I need not apply the *Brecht* analysis. *See Brown*, 596 U.S. at 134 ("a federal court must *deny* relief to a state habeas

petitioner who fails to satisfy either this Court's equitable precedents [*i.e.*, *Brecht*] or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests.").

I therefore recommend the District Court **DENY** this ground as meritless.

### B.    Ground Two: Prosecutorial Misconduct

As Ground Two, Mr. Paige asserts:

> The Appellant was denied a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10 and 16 of the Ohio Constitution, due to repeated instances of prosecutorial misconduct, including having the police vouch for the credibility and truthfulness of Jasmin Fletcher's out of court statements, for eliciting testimony regarding the out of court statements and for calling Fletcher's attorney and introducing evidence regarding her plea of guilty and the reasons for her assertion of her Fifth Amendment privilege.

(ECF #1, PageID 17). He further explains in his Traverse that "[i]t appears that the prosecutor's purpose was to gain an unfair advantage by using the testimony of Kivlighan to cumulatively corroborate the testimony offered by Det./Sgt. Spotleson and Martin, that testimony being unreasonably determined to be harmless beyond a reasonable doubt. (ECF #13, PageID 1208).

The State argues this claim[1] has been procedurally defaulted because the Seventh District enforced its contemporaneous rule against Mr. Paige in its review of this issue. (ECF #7, PageID 71-74). On this issue, the Seventh District stated:

> ASSIGNMENT OF ERROR NO. 2
>
> The Appellant was denied a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10 and 16 of the Ohio Constitution, due to repeated instances of prosecutorial misconduct, including having the police vouch for the credibility and truthfulness of Jasmin Fletcher's out of court

---

[1]    In its Return of Writ, the State indicates that Mr. Paige "procedurally defaulted his third habeas ground relating to prosecutorial misconduct . . . ." (ECF #7, PageID 71), but I determine through context that the State intended to argue that Ground Two, not Ground Three, is procedurally defaulted.

statements, for eliciting testimony regarding the out of court statements and for calling Fletcher's attorney and introducing evidence regarding her plea of guilty and the reasons for her assertion of her Fifth Amendment privilege.

[¶41] In his second assignment of error, Appellant asserts multiple instances of prosecutorial misconduct occurred which deprived him a fair trial. Appellant again refers to the testimony of Det./Sgts. Spotleson and Martin that recounts Fletcher's statements, reference to Fletcher's statements by the state during closing argument, and the state's decision to call Fletcher's attorney as a rebuttal witness in this case.

[¶42] Regarding the testimony of Det./Sgts. Spotleson and Martin, Appellant contends both officers improperly vouched for Fletcher's credibility. During this testimony the state asked both whether the statements made by Fletcher were corroborated by the findings of the medical examiner and were corroborated by other information regarding the scene of the incident.

[¶43] In determining whether prosecutorial misconduct has occurred, we must determine whether the comments or questions were improper and, if they were, whether they prejudiced Appellant's substantial rights. The benchmark of this analysis is "the fairness of the trial, not the culpability of the prosecutor." Vouching for a witness occurs when, "the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue."

[¶44] In *State v. Huff*, relied on by Appellant, the First District reversed a conviction for felonious assault and concluded a defendant was denied a fair trial when the prosecutor elicited testimony from a detective about whether he thought the victims in the matter were credible. The prosecutor in *Huff* asked the detective whether he thought there was any doubt about the victims' identification of the shooter. There was no objection by defense counsel and the detective responded that he absolutely found the victims credible and that they were telling the truth.

[¶45] As in *Huff*, defense counsel did not object to the testimony of Det./Sgts. Spotleson and Martin regarding Fletcher's statements, thus waiving all but plain error. As earlier discussed, Det./Sgts. Spotleson and Martin testified that the statements made by Fletcher corroborated the findings already made in their investigation as well as those of Marzullo, who had investigated the scene, and of Dr. Ohr, the medical examiner. Testifying about whether witness statements match other findings of an investigation is not akin to vouching for that witness' credibility. No improper vouching occurs so long as the prosecutor or the witness does not express any personal belief about another witness' credibility. While improper on other grounds, there was no improper vouching for the credibility of the declarant, here. Neither Det./Sgts. Spotleson nor Martin testified that they found Fletcher credible.

44

Simply because information she gave was consistent with another witness' findings is not improper vouching.

[¶46] Appellant also contends the prosecutor relied on Det./Sgts. Spotleson and Martin's testimony and their allegedly vouching for Fletcher's credibility during closing argument by stating:

There were three people there that afternoon. Three people in that stairwell. Unfortunately, probably the best person of the three isn't here to tell us what happened, the other two are.

Jasmin Fletcher and Michael Paige both told the police what happened. They both said where everybody was standing and they both said who fired the shots.

[¶47] Again, while the statements of Fletcher were improperly submitted on other grounds, no vouching occurred here. The state was recounting the testimony at trial, including that Appellant's version of the incident in his admission matched what Fletcher told the officers. However, the prosecutor neither implied knowledge of facts outside of the record nor placed his personal credibility at issue by making such argument and again, if we remove any reference to Fletcher and her statements, as we must, the state's observation that Appellant's confession contained all the relevant information necessary to find guilt appears accurate. Further, since the jury could actually witness Appellant confessing to the crime and could accurately judge his credibility for themselves, mention of the improperly admitted Fletcher statements cannot be error in this instance. Thus, no plain error is present.

[¶48] Finally, Appellant alleges prosecutorial misconduct when the state called Fletcher's counsel, Attorney Kivlighan, as a rebuttal witness in relation to Fletcher's assertion of her Fifth Amendment privilege. The admission of rebuttal testimony is left to the discretion of the court. The purpose of a rebuttal witness is to allow the state to refute new evidence offered by the defendant in the presentation of his case. Evidence that is merely cumulative and that does not contradict or refute evidence presented in the opposing party's case-in-chief is not proper rebuttal evidence. However, when the evidence contradicts the opposing party and also happens to bolster the state's case-in-chief it is not inappropriate.

[¶49] The matter of whether Fletcher was able to assert her Fifth Amendment privilege against self-incrimination when called as a defense witness in this case was discussed at length on the record before the jury. While Fletcher initially failed to appear in this matter, Appellant called Fletcher as a witness after she appeared pursuant to a material witness warrant issued for her. Once Fletcher refused to testify, invoking the Fifth Amendment, defense counsel requested the court to instruct Fletcher to respond, arguing that she had no basis for invoking the privilege. The court inquired as to the state's position, but the prosecutor left the matter to the trial

court's discretion. The court then inquired of Fletcher's attorney, Attorney Kivlighan, who was present in the courtroom, about the basis of Fletcher's claims to privilege. Citing *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307 (1998), paragraph one of the syllabus, Kivlighan responded that although Fletcher had pleaded guilty to her role in the matter, she had not been sentenced. Therefore, absent sentencing pursuant to her plea, her incrimination was not complete. The trial court ruled that Fletcher could assert her Fifth Amendment rights and refuse to testify. As the matter appeared to be settled, the defense called its next witness. At the close of the defense's case, the trial court asked the state to call their rebuttal witness and Atty. Kivlighan testified, in pertinent part:

Q Through your practice, do you represent a woman by the name of Jasmin Fletcher?
A I do.
Q And you were present this morning when she came in and took the Fifth Amendment when she was called to testify, correct?
A That's correct.
Q You're representing her in the criminal matters that occurred out of this incident, correct?
A That's correct.
* * *
Q Okay. Are you aware that she has entered pleas of guilty to tampering with evidence and obstructing justice?
A I'm aware of that, yes.
Q And have you, on her behalf, filed a motion to vacate those pleas, or that plea?
A Yes, that motion was filed.
Q Okay. And the effect of that, if that motion was granted, would mean she has not been found guilty, she would sit here, her case could go to trial, another plea agreement could be reached, it could be dismissed, but basically we are starting over from square one, basically?
A Yes, if the motion was granted.
Q Okay. Based on the fact that that motion had been filed, the motion to vacate the plea, did you discuss with her ~ and I am not asking what you discussed ~ did you discuss with her the prospect of her testifying in this matter?
A In conjunction with filing the motion, we did discuss whether or not she would testify in this matter.
[DEFENSE COUNSEL] Judge, I'm going to object and can we approach the bench?

[¶50] At this point, a discussion was had off the record and the trial court then sustained defense counsel's objection and the witness was excused.

[¶51] Citing *State v. Dinsio*, Appellant contends the testimony of Atty. Kivlighan as a rebuttal witness was highly prejudicial and that the state was prevented from calling the rebuttal witness when it knew that Fletcher would assert her Fifth Amendment privilege. In essence, Appellant contends the state used Kivlighan's testimony as a

way to get highly prejudicial testimony before the jury when it could not get that direct testimony to the jury through Fletcher. In *Dinsio*, the Ohio Supreme Court held that a witness who has indicated he will not testify because he was invoking his Fifth Amendment right against self-incrimination cannot be called to testify and be subjected to continued questioning that goes unanswered in order to get evidence before a jury using innuendo or inferences. If such an attempt occurs, the trial court may instruct the jury to draw no conclusion from the witness' decision to invoke the privilege.

[¶52] Contrary to Appellant's assertion, we do not find the rebuttal witness' testimony prejudicial to Appellant. If anything, placing Attorney Kivlighan on the stand as a witness could only serve to hurt the state's case. Fletcher invoked her Fifth Amendment privilege in front of the jury. This resulted in the codefendant in the case appearing to admit to a degree of culpability in the matter. By placing her attorney on the stand, the state now reminded the jury that Appellant's codefendant in the case invoked her privilege against self-incrimination. This scenario has the opposite effect of creating prejudice to Appellant, because it appears that it should only serve to create doubt as to Appellant's guilt.

[¶53] The state did not call Fletcher to testify although both parties had subpoenaed her as a witness. It was when the defense called her to testify that she invoked the privilege not to testify. It is not apparent from the record that the state had any prior knowledge that Fletcher would invoke her privilege. Regardless, defense counsel elected to call her as a witness and it was Appellant's counsel who questioned her ability to invoke the privilege. Therefore, the issue of whether Fletcher was able to invoke a Fifth Amendment privilege was raised by the defense and the state offered no objection or argument on the matter. It appears a discussion was had off the record after Fletcher was dismissed. There may have been a discussion concerning the use of a rebuttal witness, but as it was held off the record, this is purely speculation. The trial court asked the state to proceed with its rebuttal witness without any prior reference to such a witness in the record. Moreover, there was no initial objection to the state calling Fletcher's counsel on rebuttal. Counsel objected to the testimony only when questioning progressed to the issue of whether Fletcher would testify in the instant case. Atty. Kivlighan's testimony could be construed as cumulative as the issue of Fletcher's guilty pleas had been raised at the time she invoked her privilege. However, as his testimony also raised the status of those guilty pleas and the potential for her to go to trial on the offense charged, if it was error to allow this witness to testify, the testimony itself had no prejudicial effect on Appellant's trial. In fact, if it caused any harm this harm could only be on the state which had elected not to call Fletcher as a witness. The trial court did not abuse its discretion in admitting the rebuttal testimony nor did any prosecutorial misconduct occur. Appellant's second assignment of error is without merit and is overruled.

*Paige*, 2019 WL 1400327, at *9-12 (citations omitted).

Here, I agree the claim in Ground Two is procedurally defaulted because no objection was lodged during trial and the Seventh District enforced its contemporaneous objection rule in this matter. I thus turn to the four-part *Maupin* analysis described earlier.

Ohio has a long-standing and consistently enforced contemporaneous objection rule prohibiting review of a claim where no objection was made at trial. *State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001) ("The waiver rule requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review. The rule is of long standing, and it goes to the heart of an adversary system of justice."). In Ohio, failing to object to an issue that could have been corrected at trial waives all but plain error. *See State v. Mason*, 694 N.E.2d 932, 951 (Ohio 1998). This satisfies the first prong of the *Maupin* analysis.

The question thus becomes whether the state court enforced the procedural rule. Courts in the Sixth Circuit have determined that an Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *See, e.g., Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2009); *Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006); *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002). A state appellate court's review under plain error analysis is not equivalent to a review on the merits. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). The Seventh District, in its review of Ground One, noted the failure to object and reviewed under a plain error standard. *Paige*, 2019 WL 1400327, at *9 ("[D]efense counsel did not object to the testimony of Det./Sgts. Spotleson and Martin regarding Fletcher's statements, thus waiving all but plain error."). Thus, the Seventh District enforced the procedural rule and satisfies *Maupin's* second prong.

48

The third prong of the *Maupin* analysis is satisfied because the contemporaneous objection rule has long been established as an adequate and independent state ground to bar federal habeas review. *See, e.g., Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("Ohio's contemporaneous objection rule constitutes an adequate and independent state law ground that bars federal habeas review absent a showing of cause and prejudice.").

Mr. Paige claims he can overcome procedural default because trial counsel was ineffective by not objecting to the inadmissible hearsay testimony from the police detectives in violation of his Confrontation Clause rights. (ECF #13 at PageID 1210). Ineffective assistance of counsel may serve as cause to excuse a procedural default where the ineffective assistance claim itself is not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). In addition to cause, Mr. Paige must also show he was prejudiced by the ineffectiveness of his counsel. For the reasons stated in more detail in Ground Three below, his ineffective-assistance claim is without merit. As such, he has not shown he was prejudiced by the deficient performance of his counsel and thus his assertion of ineffective assistance of counsel will not demonstrate cause and prejudice sufficient to overcome procedural default.

Furthermore, Mr. Paige cannot show that failure to review his claims on the merits will result in a fundamental miscarriage of justice because he has not asserted a valid actual innocence claim supported by new reliable evidence that was not presented at trial. *Schlup*, 513 U.S. at 324.

Thus, all four *Maupin* prongs are met and Ground Two is procedurally defaulted. Accordingly, I recommend the District Court **DISMISS** Ground Two.

### C.    Ground Three: Ineffective Assistance of Counsel

As his third assignment of error, Mr. Paige raises the following:

> The Appellant received ineffective assistance of trial counsel when his trial attorney failed to object to numerous instances of prosecutorial misconduct and the admission of clearly inadmissible hearsay statements and failed to file a motion to suppress statements made by Appellant, to his girlfriend, that were surreptitiously recorded by the police.

(ECF #1, PageID 17).

The State argues this ground is meritless because Mr. Paige cannot demonstrate, under *Strickland*, that the result of the proceeding would be different. (ECF #7, PageID 95-102). Moreover, he has not shown that the Seventh District's determination of the matter was an unreasonable determination of the facts or an unreasonable application of *Strickland*. (*Id.* at PageID 102).

*Strickland* establishes a two-part test to determine whether a defendant was denied effective assistance of counsel:

> First, defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. To satisfy the deficiency prong, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 668. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, "the defendant must

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up).

This is an extremely deferential standard, because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. In particular, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91. Moreover, this inquiry requires eliminating "the distorting effects of hindsight . . . [in order] to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The goal is not to ensure that a criminal defendant be afforded perfect counsel, but rather "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision." *Id.* at 687.

The Seventh District reviewed the *Strickland* claim as follows:

### ASSIGNMENT OF ERROR NO. 3

> The Appellant received ineffective assistance of trial counsel when his trial attorney failed to object to numerous instances of prosecutorial misconduct and the admission of clearly inadmissible hearsay statements and failed to file a motion to suppress statements made by Appellant, to his girlfriend, that were surreptitiously recorded by the police.

[¶54] In his third assignment of error, Appellant claims he received ineffective assistance of counsel when trial counsel failed to object to prosecutorial misconduct and the admission of hearsay, and failed to file a motion to suppress the conversation recorded between Appellant and his girlfriend after he admitted to being the shooter.

[¶55] In a claim for ineffective assistance of counsel, a reviewing court is highly deferential to trial counsel's strategy and must indulge in a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. Appellant bears the burden of demonstrating that counsel's performance fell below an objective standard of professional competence. If successful in demonstrating that counsel committed professional error, the appellant must then demonstrate he was prejudiced by that deficiency.

51

[¶56] "Deficient performance" means performance falling below an objective standard of reasonable representation. "Prejudice" in this context, means a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Reversal as a result of prejudice from defective representation is justified only where the results are unreliable or the proceeding was clearly fundamentally unfair due to counsel's performance.

[¶57] "An ineffectiveness claim * * * is an attack on the fundamental fairness of the proceeding whose result is challenged." An appellant's burden when challenging the effectiveness of counsel is to demonstrate that some action or inaction by counsel operated to undermine or call into question the integrity of the process that resulted in conviction.

[¶58] The testimony of both Det./Sgts. Spotleson and Martin was reviewed in Appellant's first assignment of error. The admission of the testimony was error, but resulted in no prejudice to Appellant, as the overwhelming evidence at trial supported Appellant's convictions. It is not enough that any error by counsel can be shown to have "some conceivable effect on the outcome of the proceeding." Although an objection to the testimony may have been appropriate, we cannot conclude that the failure to do so resulted in prejudice that undermined the "fundamental fairness" of the proceedings. Again, the jury had before it the videotaped confession by Appellant that he shot Blake. Standing alone, this was sufficient to establish guilt beyond a reasonable doubt. Further, allowing the officers to testify about what Fletcher told them does reveal a potential trial strategy, as Fletcher was the prime suspect and Appellant's involvement was not known to the police until Fletcher raised it. Potentially, trial counsel wanted to show that Fletcher was the shooter and that she implicated Appellant only to shift the focus from her own guilt. Regardless, there is no ineffective assistance shown, here.

[¶59] Appellant also asserts counsel was ineffective for failing to file a motion to suppress the recorded conversation between Appellant and his girlfriend for "invasion of privacy." According to the record, the conversation took place after Appellant's second interview where he confessed he was the shooter. Following his confession, his girlfriend was allowed to visit him in the interview room. Det./Sgt. Spotleson testified on cross-examination that the recording equipment was still on and that the camera was hidden. Det./Sgt. Spotleson also testified that Appellant was not told he was being recorded while speaking with his girlfriend. The conversation between Appellant and his girlfriend is brief. In this portion of the video, the jury could see Appellant apologizing to his girlfriend and clearly stating "I told them I shot him," and "I pulled the trigger." No actual testimony was elicited from any witness regarding Appellant's conversation with his girlfriend and there was no indication that any new information was gleaned by law enforcement during the conversation. In fact, contrary to Appellant's assertion that the state "heavily relied" on the conversation in its closing argument, other than being raised in the briefs before us, the only reference is in the state's closing where the prosecutor stated,

"[b]ut in the end, he still says, I pulled the trigger. And he tells his girlfriend that outside the presence of the police."

[¶60] The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." Under the two-part test for assessing whether trial counsel was ineffective, we look first to whether trial counsel's performance fell below an objective standard of reasonable competence. This portion of the video was played to the jury after they had already seen Appellant's videotaped confession to the detectives. The only other reference at trial to the conversation was briefly in the state's closing argument. It is clear counsel could not be deemed ineffective for failing to seek suppression of the recording. As Appellant had just admitted to the detectives that he was the shooter, the same admission by Appellant to his girlfriend would be only cumulative evidence for the state. The video itself shows Appellant and his girlfriend embracing and crying as he informed her that he shot the victim.

[¶61] Appellant cites our holding in *State v. Clemons*, 7th Dist. No. 10 BE 7, 2011-Ohio-1177 as support. However, Appellant concedes that we held in *Clemons* that there can be no reasonable expectation of privacy in a police interrogation room. In *Clemons*, the defendant argued that a recording of his conversation with his wife in the police interrogation room constituted a violation of the Fourth Amendment and Ohio electronic surveillance laws. The defendant had voluntarily given a statement to police in the interrogation room and was informed of his *Miranda* rights. All interrogations in the room were recorded although interviewees were not informed unless they asked. At the end of the interview Clemons was given five minutes to speak with his wife. Clemons admitted to his wife, "I'm caught." The conversation was recorded on video. Clemons filed a motion to suppress based on spousal privilege. The trial court denied the motion to suppress. On appeal, Clemons abandoned the spousal privilege argument and contended the recording violated his Fourth Amendment right against illegal search and seizure. We affirmed the judgment of the trial court concluding:

[T]here is really nothing to distinguish a police interrogation room from conversations in the back of a police car. Leaving the interrogation room and closing the door is similar to leaving a patrol car and closing the door (or walking away where the subjects can see the officer is too far away to overhear their conversation).

[¶62] We held that the trial court "could rationally find that an objective person had no reasonable expectation of privacy under the circumstances existing herein." As in *Clemons*, Appellant had admitted his crime to the police officers and was allowed to speak with his girlfriend directly afterward. Appellant distinguishes *Clemons* based on the fact that the interrogation room in that case had a large mirror which would indicate that there was surveillance. However, this argument is not persuasive. As in *Clemons*, the camera was hidden, the subjects were not informed they were being recorded. Notably, also as in *Clemons*, Appellant was under arrest and in custody before his interview and had been read his *Miranda* warnings. At the time he had the

> conversation with his girlfriend, he had spent over an hour in the interrogation room with two police detectives to whom he admitted that he shot Blake. Based on these circumstances and as in *Clemons*, "[t]he general public has no reason to frequent" a police interrogation room "or to believe that it is a sanctuary for private discussions." We conclude that Appellant had no reasonable expectation of privacy in the interrogation room. Therefore, there was no violation of his privacy or Fourth Amendment rights. As such, trial counsel's decision not to file a motion to suppress the conversation was not deficient performance under the *Strickland* standard for ineffective assistance of counsel as Appellant has not demonstrated that the filing of the motion to suppress would have a reasonable probability of success. Appellant's third assignment of error is without merit and is overruled.

*Paige*, 2019 WL 1400327, at *12-13.

Here, the Seventh District reviewed under *Strickland* to determine that his counsel's performance was not deficient under any of the errors raised. It determined first that, while Det./Sgts. Spotleson and Martin's testimony was improperly admitted, it resulted in no prejudice to Mr. Paige, and did not undermine the "fundamental fairness" of the proceedings. *Id.* at *12 (quotation omitted). Similarly, the Seventh District found that counsel's performance did not fall below an objective standard of reasonableness for failing to file a suppression motion regarding a recording made of himself and his girlfriend. *Id.* at *13. Moreover, he has not shown that filing the motion to suppress had a reasonable probability of success – in part because this was, again, cumulative evidence. *Id.* As I did above, I find the admitted evidence did not have a prejudicial effect on the outcome of the proceedings and that counsel's failure to object at trial, or to file a suppression motion, did not fall below an objective standard of reasonableness, and would likely not have changed the result; accordingly, the Seventh District appropriately applied *Strickland*.

Where the defendant fails to overcome the presumption that the challenged conduct might be considered sound trial strategy, courts will not find ineffective assistance. *Strickland*, 466 U.S. at 689. Judicial scrutiny of counsel's performance is highly deferential. Mr. Paige has not

established that trial counsel's performance was constitutionally deficient, and therefore cannot meet the *Strickland* standard. Moreover, he has not demonstrated prejudice in his briefings before this Court. Indeed, the Seventh District determined, and I concur, that Mr. Paige has not shown how his requested trial strategy would have had a reasonable probability of success.

Thus, I recommend the District Court **DENY** Mr. Paige's third ground for relief.

### D.    Ground Four: Cumulative Error

As his fourth assignment of error, Mr. Paige asserts that "the cumulative effect of numerous errors deprived [him] of his right to a fair trial." (ECF #1, PageID 17). The State argues cumulative error is not cognizable in habeas corpus and should be dismissed. (ECF #7, PageID 67-68).

Cumulative error is not cognizable on federal habeas review. *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (cumulative error not cognizable on federal habeas review because the U.S. Supreme Court has not spoken on the issue). Thus, Ground Four is not subject to review by this Court. Even if such a claim were cognizable, if the individual claims making up the cumulative error claim are themselves procedurally barred or without merit, the cumulative error claim "must also fail." *Ramsey v. Phillips*, No. 20-3452, 2020 WL 9423257, at *3 (6th Cir. Nov. 4, 2020). Because in this Report and Recommendation I have recommended the District Court dismiss as procedurally defaulted or deny as meritless all other grounds for relief in this petition, Ground Four must necessarily also fail.

Thus, I recommend the District Court **DISMISS** Ground Four as not cognizable.

### E.    Ground Five: Speedy Trial

Finally, Mr. Paige presents as his fifth assignment of error that "Appellant was denied his constitutional and statutory right to a speedy trial and his right to the effective assistance of

counsel when counsel failed to seek his discharge on speedy trial grounds." (ECF #1, PageID 17) (cleaned up). The State argues this Ground is procedurally defaulted as not fairly presented to the state court on the same grounds as it is presented here – *i.e.*, that he presented it solely as an error of state law and did not indicate a federal constitutional error for the state court to correct. (ECF #7, PageID 74-77). Rather, it was "a technical legal argument which required the Ohio Seventh District Court of Appeals to determine whether it was reasonable to toll his speedy trial time in light of the Ohio statutory requirements and two mistrials." (*Id.* at PageID 76). Because he did not fairly present this issue to the state courts, it is now barred by *res judicata*, and further, because he has no remaining remedy in state court, this claim is procedurally defaulted. (*Id.* at PageID 77-78).

Federal courts have jurisdiction to consider only those habeas claims that were first "fairly presented" to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (quotation omitted). A claim may only be considered "fairly presented" if the petitioner asserted both the factual and legal basis for his claim to the state courts. *McMeans*, 228 F.3d at 681 (quotation omitted). However, "[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans*, 228 F.3d at 681 (quotation omitted). "When a petitioner has failed to fairly present his claims to the state courts and no state remedy remains, his claims are considered to be procedurally defaulted." *Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015).

Here, Mr. Paige has not identified the specific federal constitutional rights he asserts were violated, either in this Court or in the state court. In his direct appeal, he merely argues "he was not brought to trial in a reasonable time after two mistrials were declared, in violation of his right to a speedy trial." *Paige*, 2019 WL 1400327, at *14. In his petition, he provides the same:

"petitioner was not brought to trial in a reasonable time after two mistrials were declared, in violation of his right to a speedy trial." (ECF #1, PageID 21). He does not further address this issue in his Traverse. (*See* ECF #13). As such, his argument as to his speedy trial rights are the type of "general allegation" warned against in *McMeans* and were not fairly presented to the state court. Thus, his speedy trial claim is barred by *res judicata*, and, because he has no further remedy available in state courts, Ground Five is procedurally defaulted here.

As noted earlier, a petitioner can overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claim is not considered, such as by properly presenting an actual innocence claim. Mr. Paige has not made an actual innocence claim, nor has he raised the type of evidence that would have made it more likely than not that no reasonable juror would have convicted him. Instead, as noted numerous times during the state appellate court's review, Mr. Paige had confessed, on video, to committing the crime. As such, no fundamental miscarriage of justice will occur if Ground Five is not considered here.

Thus, I recommend the District Court **DISMISS** Ground Five as procedurally defaulted.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability (COA) and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S.

473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not required to grant a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Paige has not made a substantial showing that he was denied any constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are valid claims of the denial of constitutional rights. Similarly, no procedural ruling appears to be in error. Therefore, I recommend the District Court not grant Mr. Paige a COA as to any ground.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I recommend the District Court **DISMISS** the Petition as untimely; or, in the alternative, **DISMISS** Grounds Two and Five as procedurally defaulted, **DISMISS** Ground Four as not cognizable, and **DENY** Grounds One and Three as meritless. Finally, I recommend the District Court **DENY** a Certificate of Appealability as to all grounds.

Dated: February 1, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the**

58

proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).